1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

16

| ATM SHAFIQUL KHALID, an individual and on behalf of similarly situated, XENCARE SOFTWARE, INC., | CASE NO. C19-130-RSM |
| Plaintiff, | ORDER GRANTING DEFENDANT MICROSOFT CORPORATION'S MOTION TO DISMISS |
| v. | |
| MICROSOFT CORP., a Washington Corporation, and JOHN DOE *n*, | |
| Defendants. | |

17

## I.    INTRODUCTION

18

19

20

21

22

23

        This matter comes before the Court on Defendant Microsoft Corporation ("Microsoft")'s

Motion to Dismiss Plaintiff ATM Shafiqul Khalid's amended complaint for failure to state a

claim.  Dkt. #14.  Plaintiff opposes the motion in entirety.  Dkt. #17.  The Court finds oral

argument unnecessary to resolve the underlying issues.  Having reviewed Defendant's Motion,

Plaintiff's Response, Defendant's Reply, and the remainder of the record, the Court GRANTS

Defendant's Motion to Dismiss with leave to amend certain claims as set forth below.

24

## II.    BACKGROUND

On December 16, 2011, Plaintiff received a job offer from Microsoft as a Senior Program Manager in its Bing division.  Dkt. #7 at ¶ 13.  Upon accepting the position, Plaintiff was required by Microsoft recruiter Shannon Carlsen to sign a Microsoft Employee Agreement (the "Employee Agreement") which included a provision under Section 5 regarding assignment of certain intellectual property rights:

> **5. Inventions.** I will promptly and fully disclose to MICROSOFT any and all inventions . . . whether or not patentable (collectively "Inventions") that I solely or jointly may conceive, develop, reduce to practice or otherwise produce during my employment with MICROSOFT, including those Inventions I contend that MICROSOFT does not own. Subject to the NOTICE below, I agree to grant and I hereby grant, transfer and assign to MICROSOFT or its designee all my rights, title and interest in and to such Inventions. . . .
>
> **NOTICE:** My obligation to assign shall not apply to any Invention that I can establish:
>> a) was developed entirely on my own time without using any equipment, supplies, facilities, or trade secret information owned or supplied to me by Microsoft;
>> b) does not relate (i) directly to the business of MICROSOFT or (ii) to the actual or demonstrably anticipated research or development of MICROSOFT; and
>> c) does not result, in whole or in part, from any work performed by me for MICROSOFT.
>
> . . . . In addition to the rights provided to MICROSOFT under paragraph 6 below, as to any Invention complying with 5(a)-(c) above that results in any product, service or development with potential commercial application, MICROSOFT shall be given the right of first refusal to obtain exclusive rights to the Invention and such product, service or development . . . .

Dkt. #7-1 at 2-3.  Section 6 of the Employee Agreement asked Plaintiff to attach a list "describing all Inventions belonging to me and made by me prior to my employment with MICROSOFT that I wish to have excluded from this Agreement.  If no such list is attached, I represent that there are no such Inventions." *Id.* at 3.  The Employment Agreement further noted on its first page: "If you wish to attach a list of inventions, per paragraph 6, below, please contact your recruiter." *Id.* at 2.

On December 19, 2011, Plaintiff accepted Microsoft's employment offer and signed the Employment Agreement. Dkt. #7 at ¶ 16. Plaintiff claims that because there was no way to attach a list of inventions to the online agreement pursuant to Section 6, he sent a separate email to Ms. Carlsen attaching an invention exclusion list (the "Exclusion List") denoting nine patentable items. *Id.* at ¶¶ 13, 16, 18. This Exclusion List included inventions for a mini-cloud subscription service ("the Mini Cloud") and a framework to protect computer systems from viruses and spyware ("the Safe and Secure") that he had filed prior to starting work at Microsoft. *Id.* at ¶¶ 18-19. At his Microsoft employee orientation program in January 2012, Plaintiff claims he signed a hard copy of the Employee Agreement, submitted his Exclusion List for the second time and noted by hand in the hard copy Employee Agreement that he submitted additional pages. *Id.* at ¶ 17.

Plaintiff worked at Microsoft from January 9, 2012 until February 2015. *Id.* at ¶¶ 17, 21. Plaintiff claims that during his employment, the United States Patent and Trademark Office issued patents for the Mini Cloud (patent number 8,782,637) and the Safe and Secure (patent number 8,286,219) on July 15, 2014 and October 9, 2012, respectively. *Id.* at ¶¶, 19, 28. Plaintiff further claims that during his employment, he met with various Microsoft executives who declined Plaintiff's proposals for business models based on his invention ideas. *Id.* at ¶¶ 32-37. In early February 2015, Microsoft terminated Plaintiff's employment. *Id.* at ¶ 38.

On February 19, 2015, Microsoft's in-house counsel notified Plaintiff that he had not listed any inventions under Section 6 of the Employment Agreement. *Id.* at ¶ 40-41. For that reason, in-house counsel stated, Microsoft retained an assignment right in the patents for the Mini Cloud and the Safe and Secure. Plaintiff claims that Microsoft continued to deny receipt of his Exclusion List, despite Plaintiff's requests to various employees for hard copies of his signed Employee Agreement. *Id.* at ¶¶ 42-45. On July 9, 2015, in response to Plaintiff's correspondence regarding his Mini Cloud and Safe and Secure patents, in-house counsel for Microsoft allegedly offered to

put together an agreement if Plaintiff "agreed to give Microsoft royalty free access to all present and future patents related to the Mini-cloud systems in exchange for resolving all disputes." *Id.* at ¶ 46. Plaintiff claims he declined this offer.

On May 27, 2016, Plaintiff received a letter from Microsoft's outside counsel re-stating Microsoft's position that Plaintiff had granted Microsoft a "royalty-free license, irrevocable, worldwide license" to those inventions. *Id.* at ¶ 49 (quoting Dkt. #7-7 at 4). Outside counsel offered to transfer to Plaintiff all of Microsoft's ownership interest in the Safe and Secure and Mini Cloud patent families in exchange for his granting Microsoft a non-exclusive, royalty-free license to the disputed patent families and fully releasing Microsoft from all claims and liability. Dkt. #7-7 at 4.

On January 28, 2019, Plaintiff filed this action against Microsoft. Dkt. #1. In addition to alleging fraud in his particular case, Plaintiff seeks to challenge the general legality of Microsoft's Employee Agreement on behalf of all Microsoft employees who signed similar agreements with Microsoft. Under Plaintiff's theory, Microsoft obtains an employee's patent rights through an overly-broad patent rights assignment provision under Section 5. Dkt. #7 at ¶ 65-67. When the employee leaves Microsoft, Plaintiff claims that Microsoft then disregards or destroys their exclusion list submitted under Section 6, thereby "contaminating" the employee's patent and requiring the employee to invest tremendous financial resources to clear their patent right through court. *Id.* at ¶¶ 71-72. As a result, Microsoft employees—who cannot afford to litigate Microsoft, nor want to abandon their patent work—hand over their patent rights from the time they sign their employment agreements yet continue working to develop their patents. *Id.* at ¶¶ 75, 85-89. Plaintiff claims that Microsoft's scheme specifically violates laws under antitrust, forced labor, racketeering, civil rights, and fraud. *Id.* at ¶ 64.

### III.    DISCUSSION

**A.  Relevant Legal Standards**

**1.  Motion to Dismiss**

In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as true and makes all inferences in the light most favorable to the non-moving party. *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted). However, the court is not required to accept as true a "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678.  This requirement is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The complaint need not include detailed allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Absent facial plausibility, a plaintiff's claims must be dismissed. *Id.* at 570.

**2.  Pro Se Considerations**

The Court must also remain mindful that Plaintiff is proceeding pro se.  "The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants." *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987) (citing *Boag v. MacDougall*, 454 U.S. 364, 365 (1982)).  Pro se plaintiffs are ultimately held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Nevertheless, "courts should not have to serve as advocates for pro se litigants." *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987).  Indeed, "[h]e who proceeds pro se with full knowledge and

understanding of the risks does so with no greater rights than a litigant represented by a lawyer, and the trial court is under no obligation to ... assist and guide the pro se layman[.]" *Jacobsen v. Filler*, 790 F.2d 1362, 1365, n. 5 (9th Cir. 1986) (quoting *United States v. Pinkey*, 548 F.2d 305 (10th Cir. 1977).

### 3. Leave to Amend

Ordinarily, leave to amend a complaint should be freely given following an order of dismissal, "unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987); *see also DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) ("A district court does not err in denying leave to amend where the amendment would be futile)." (citing *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990)). Where claims are dismissed for failure to state a claim on which relief can be granted, permission to file an amended complaint is typically granted. *See* Fed. R. Civ. P. 15(a) ("[L]eave to amend shall be freely given when justice so requires"). However, where amendment would be futile, a claim is properly dismissed with prejudice. *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996). *Johnson v. American Airlines, Inc.*, 834 F.2d 721, 724 (9th Cir.1987) ("[F]utility includes the inevitability of a claim's defeat on summary judgment.").

Microsoft seeks to dismiss all twelve of Plaintiff's alleged causes of action. The Court will address each claim in turn.

### B. Certification of a Class

As an initial matter, Plaintiff seeks to certify as a class all Microsoft employees who signed an employment contract with Microsoft similar to the Employee Agreement signed by Plaintiff. Dkt. #7 at ¶¶ 134-141 (presented as "Count 7"). A pro se litigant may not serve as the representative of a class in a class action lawsuit under Fed. R. Civ. P. 23. *See Keyter v. Boeing*

*Co.*, No. C13-982-RSM, 2013 WL 4458975, at *1 (W.D. Wash. Aug. 16, 2013).  Accordingly, the Court will not consider the question of class certification at this time.

**C. Anti-Trust Claims (Counts 1-2)**

To survive a motion to dismiss, an antitrust complaint "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Newman v. Universal Pictures,* 813 F.2d 1519, 1522 (9th Cir.1987), *cert. denied,* 486 U.S. 1059 (1988).  Plaintiff claims that Microsoft's actions violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  Under Plaintiff's theory, Microsoft's Employee Agreement—which allows patent assignment rights to an employee's future inventions—enables Microsoft to fix the price of an employee's patent in its favor and to procure patents at a much cheaper cost while reducing the supply of patents in the marketplace.  Dkt. #7 at ¶¶ 93-97.  In doing so, Plaintiff argues, Microsoft claims employee's patents on bad faith or fraud in restraint of trade.  *Id.* at ¶¶ 98-100.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 1.  An antitrust claim under Section 1 requires a plaintiff to plead evidentiary facts which would prove a contract or conspiracy among two or more persons or entities, with the intent to harm or restrain trade, and which actually injures competition. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

Plaintiff has not alleged a contract or conspiracy among multiple entities—instead, his complaint only names Microsoft and employees of Microsoft as the bad actors.  *See* Dkt. #7 at ¶¶ 92-100.  It is well-established that Section 1 of the Sherman Act does not reach "wholly unilateral" conduct by a single entity.  *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (citing *Albrecht v. Herald Co.*, 390 U.S. 145, 149 (1968).  While Plaintiff argues that

a contract between an employer and employee of the same company may fall within the scope of Section 1, Dkt. #17 at 11-12, the case law cited does not support this proposition. On the contrary, *Copperweld* recognized that a company cannot conspire with itself. *Id.* at 769; *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir. 2003) ("The single-entity rule is relevant in a variety of contexts. It applies to a company and its officers, employees and wholly owned subsidiaries."). Accordingly, Plaintiff's claim under 15 U.S.C. § 1 is properly dismissed without prejudice.

Plaintiff has likewise failed to state a claim under 15 U.S.C. § 2. Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . [commits a felony]." 15 U.S.C. § 2. To state a claim for monopolization under this provision, a plaintiff must allege that the defendant (1) possessed monopoly power in the relevant markets; (2) willfully acquired or maintained its monopoly power through exclusionary conduct; and (3) caused antitrust injury. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997). To state a claim for attempted monopolization, a plaintiff must allege (1) specific intent to control process or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power" and (4) causal antitrust injury. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–1433 (9th Cir. 1995).

Plaintiff alleges both monopolization and attempted monopolization by Microsoft. *See* Dkt. #7 at ¶ 104. Under either theory, Plaintiff has failed to state a claim under Section 2. Monopoly power is defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Plaintiff claims that Microsoft

maintains monopoly power in technology areas such as office productivity software, desktop operating systems, and cloud computing. *Id.* at ¶ 101. In particular, he states that Microsoft enjoys an "88% market share" in the Desktop and Office365 cloud application market. Dkt. #17 at 14. However, "market share standing alone does not automatically equate to monopoly power." *Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996). Dominant market share alone only supports a finding of market power "if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." *Rebel Oil Co.*, 51 F.3d at 1438. Here, Plaintiff has provided no market analysis such as barriers to entry or hyper-competitive pricing that inhibits competitors from expanding their output in the cloud application market or the other identified markets. Moreover, Plaintiff has not asserted that Microsoft "willfully" acquired or maintained its monopoly power as opposed to "as a consequence of a superior product, business acumen or historical accident[.]" *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 855 (9th Cir. 1995) (internal citations omitted). Likewise, with respect to his "attempted monopolization" claim, Plaintiff has not alleged that Microsoft acted with a "specific intent" to destroy its competition in the cloud application market—only that Microsoft intentionally sought to acquire its employees' patents. *Id.* Microsoft's alleged intent to acquire employees' patents does not automatically equate to an intent to monopolize or attempt to monopolize a particular market.

Finally, the injuries alleged by Plaintiff are not within the scope of "antitrust injury" contemplated by Section 2. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999) ("[T]he antitrust laws are only intended to preserve competition *for the benefit of consumers*.") (emphasis added). Although Plaintiff claims that Microsoft's conduct injures employees by reducing the value of their patents and preventing them from entering the market, Dkt. #7 at ¶¶ 96-97, individual injury to Microsoft's employees is not equivalent to injury

to competition in the marketplace. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the protection of competition not competitors."). Plaintiff's contention that the injury is "the value of option Microsoft didn't pay," *id.* at 13, does not explain how Microsoft's conduct specifically injured competition within the identified markets nor how that injury ultimately harmed consumer welfare.

Plaintiff responds that he is not required to provide a market analysis or allege anti-trust injury because Microsoft's actions constitute a "per se violation." Dkt. #17 at 12. Yet "per se" Sherman Act violations only apply to those categories that are "manifestly anticompetitive" such as price-fixing, market division, group boycotts, and tying arrangements. *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983). Plaintiff argues that Microsoft's alleged scheme amounts to a "tying arrangement" on the basis that Microsoft combines its illegal patent assignment agreement with thousands of job offers. Dkt. #17 at 15. However, Microsoft's alleged scheme does not involve "tying"—Microsoft is not conditioning the purchase of one product on the purchase of a separate "tied" product. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461(1992) ("A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.") (internal quotations omitted). Without any basis for why Microsoft's alleged scheme amounts to a "per se" violation of antitrust laws, Plaintiff must provide the required market analysis and alleged antitrust injury to state a claim under Section 2.

For the foregoing reasons, Plaintiff's claims under 15 U.S.C. §§1, 2 (Counts 1 and 2) are properly dismissed without prejudice.

ORDER GRANTING DEFENDANT MICROSOFT
CORPORATION'S MOTION TO DISMISS - 10

**D.  Claims for Actual or Attempted Forced Labor (Count 4)**

Plaintiff also claims that Microsoft's alleged scheme comprises actual or attempted forced labor.  By requiring him to sign the Employment Agreement, Plaintiff argues, Microsoft "created a situation where Plaintiff will continue working on his patent family, add labor to perfect and prosecute his patents, and Defendant(s) Microsoft will get free access to those patents."  Dkt. #7 at ¶ 119.  Plaintiff argues that this arrangement constitutes exploitation of Plaintiff's "free labor" that he "would never offer to Defendant(s) Microsoft voluntarily" in violation of the Thirteenth Amendment of the U.S. Constitution and the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589 et seq.  *Id.* at ¶ 120.

The Thirteenth Amendment abolished slavery and involuntary servitude in the United States.  U.S. CONST. art. XIII.  The TVPRA was passed by Congress to reach cases of modern-day human trafficking, where victims may be "held in a condition of servitude through nonviolent coercion."  *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (quoting Victims of Trafficking and Violence Protection Act of 2000 § 102(b)(13)) (internal quotations omitted).  The statute provides a cause of action for individuals who are coerced to work against their will because of serious harm or threat of serious harm—even if that harm is non-physical.  *See* 18 U.S.C. 1589(a)-(b).

Here, Plaintiff's claims cannot conceivably amount to "forced labor."  Microsoft allegedly created a "serious threat of claiming the exclusive right to Khalid's patent" given that "no buyer will buy Khalid's patent to face litigation with Microsoft."  Dkt. #17 at 16.  In doing so, Plaintiff argues, Microsoft has left him three options: (1) continue working to prosecute his patent family; (2) stop working on his patent and destroy his patent portfolio; or (3) wage a costly legal battle against Microsoft.  *Id.*  Victims of forced labor are coerced to work against their will because of serious harm or threat of serious harm.  Plaintiff has not been coerced to continue working on his

patents. On the contrary, he *wants* to continue working on his patent family because of the time and money already invested but may voluntarily choose *not* to do so because of Microsoft's alleged scheme that contaminated his patents. By definition of "forced labor," Plaintiff has not been coerced into working against his will and has therefore failed to state a claim under the Thirteenth Amendment and § 1589. This deficiency cannot be cured through amendment and warrants dismissal of Count 4 with prejudice.

**E. Racketeering Claims under 18 U.S.C. § 1964 (Counts 3, 5)**

Plaintiff also brings two claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). Plaintiff alleges civil RICO violations through extortion and forced labor. *See* Dkt. #7 at ¶¶ 105-115 (extortion count); ¶¶ 121-125 (forced labor count). The Court has already determined that Plaintiff cannot assert a viable forced labor claim under 18 U.S.C. § 1589. For that reason, Plaintiff's racketeering claim predicated on forced labor, Count 5, is properly dismissed with prejudice. The Court will now address Plaintiff's remaining RICO claim predicated on extortion.

Plaintiff has not alleged sufficient facts to plausibly lead to his asserted RICO claim. To plead a RICO claim under 18 U.S.C. § 1962, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000). A "pattern of racketeering activity" requires at least two predicate acts to constitute racketeering activity. *See* 18 U.S.C. §1961(5). While Plaintiff makes a passing reference to fraud in discussing his claim, Dkt. #7 at ¶ 108, an earlier section of his complaint indicates that he claims extortion as the predicate act for his RICO claim. *See id.* at ¶¶ 3-4.

In support of its RICO claim, Plaintiff alleges two predicate acts: (1) extortion under the Hobbs Act and; (2) extortion in the second degree under the Washington Racketeering Act, RCW 9A.56.130. *Id.* The Hobbs Act defines extortion as "obtaining of property from another, with his

consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b). The "obtaining" element "requires a showing that a defendant received something of value from the victim of the alleged extortion and that the "thing of value can be exercised, transferred, or sold." *United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009). Washington law defines "extortion" as "knowingly to obtain or attempt to obtain by threat [the] property or services of the owner . . . ." RCW 9A.56.110. Extortion in the second degree means "extortion by means of a wrongful threat . . . ." RCW 9A.56.130.

Plaintiff's complaint does not allege conduct by Microsoft that constitutes extortion under the Hobbs Act or Washington state law. Plaintiff claims that Microsoft wrongfully acquired or attempted to acquire his patent rights through enforcing its Employment Agreement, but nowhere does he identify any wrongful "threat" or other proscribed misconduct sufficient to plead extortion. On the contrary, the only alleged conduct by Microsoft—phone calls with in-house counsel and a letter to Plaintiff from outside counsel summarizing the terms of the Employee Agreement and describing a proposed agreement—do not amount to threats of violence, force, or fear within the scope of RICO. Plaintiff's Response only offers the conclusory statement that Microsoft's enforcement of its "illegal" contract "rose to the level of extortion[.]" *See* Dkt. #17 at 23. He has not explained how particular actions by Microsoft amounted to extortive acts as defined under either the Hobbs Act or RCW 9A.56.130. The complaint therefore fails to sufficiently allege a predicate act. *See ICT Law PLLC v. SeaTree PLLC*, No. C17-1681-TSZ, 2018 WL 4951942, at *3 (W.D. Wash. Oct. 12, 2018) ("Plaintiff cannot rely on mere labels and conclusions to support its RICO theory").

Furthermore, Plaintiff has failed to adequately allege an "enterprise" under RICO. Plaintiff claims that several entities within and outside of Microsoft constitute either an enterprise or an associate-in-fact enterprise under RICO: Microsoft itself, Microsoft's offshore operations,

Microsoft's intellectual property licensing program, associates such as Appleby law firm, and other "partners and vendors" that receive benefits through an intellectual property-sharing partnership. Dkt. #7 at ¶¶ 107-111. Vague terms such as "offshore operations," "associates" and "partners and vendors," *see* Dkt. #7 at ¶¶ 108-111, do not provide Microsoft or the Court with sufficient notice of the individuals or entities, inside or outside of Microsoft, that form the alleged "enterprise" engaged in racketeering. Plaintiff has also not articulated a common purpose of the alleged "enterprises" beyond a typical business relationship. *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) ("To show the existence of an enterprise under the second element, plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose.") (citing *Boyle v. United States,* 556 U.S. 938, 946 (2009)). Instead, Plaintiff alleges that these various entities enjoy mutual benefits through their partnerships and explains how money flows between the various entities. *See* Dkt. #7 at ¶¶ 105-115. These allegations do not set forth a viable RICO claim.

Accordingly, Plaintiff's RICO claims predicated on extortion, Count 3, are dismissed without prejudice for failure to state a claim.

### F. Civil Rights Violations (Counts 6, 12)

Plaintiff also alleges violations of his civil rights under 42 U.S.C. § 1983 and § 1985. Specifically, Plaintiff claims that Microsoft received billions of dollars from the federal government in the form of tax credits for its research and development expenses that paid Plaintiff's salary. Dkt. #7 at ¶ 179. By using this federal benefit to pay his salary, Plaintiff argues, Microsoft "acted under the color of state [law] while infringing on Khalid's constitutional rights" in violation of 42 U.S.C. § 1983. Plaintiff's claim under Section 1985 follows a similar logic that receipt of the federal benefit equates to acting under the color of state law. *Id.* at ¶ 133. The §

1985 claim also adds Plaintiff's contention that Microsoft employed multiple employees, recruiters, and attorneys who conspired to have Plaintiff sign an overbroad employee agreement through the false pretense of an "inventive disclosure," thereby engaging in fraud and conspiracy giving rise to a violation of 42 U.S.C. § 1985. *Id.* at ¶¶ 127-129.

Even if Plaintiff timely filed these claims within the three-year statute of limitations period, his allegations fail to satisfy the required elements of civil rights claims under §§ 1983 and 1985. A claim under § 1983 requires that a person or entity be acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" when depriving a party of his rights, privileges or immunities. 42 U.S.C. § 1983. "Only in rare circumstances" will a court view a private party as a state actor for § 1983 purposes. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999). For private conduct to constitute governmental action, there must be a "close nexus between the State and the challenged action that seemingly private behavior may be treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295 (2001) (internal quotations omitted).

Here, Microsoft using government tax credits to pay employees' salaries cannot conceivably establish the "close nexus" necessary for Microsoft to comprise a state actor. Given that the *federal* government provided these tax credits, *see* Dkt. #7 at ¶ 179, Plaintiff fails to explain how the credits create any nexus between Microsoft and a *state* actor as required under § 1983. *Morse v. N. Coast Opportunities, Inc.*, 118 F.3d 1338, 1343 (9th Cir. 1997) ("[B]y its very terms, § 1983 precludes liability in federal government actors."). Moreover, merely receiving tax credits does not intertwine Microsoft and the public sector to the point where Microsoft's actions are effectively the government's. Even in cases where the government has heavily funded a private entity, mere funding is not sufficient to create a "close nexus"—the government must somehow profit from the private actor's violations. *See Rendell-Baker v. Kohn*, 457 U.S. 830,

841–42 (1982) (Heavily financed and regulated school not a state actor absent a showing that government profited from school's alleged constitutional violations). None of Plaintiff's allegations explain how Microsoft's actions constitute "state action," nor is there any conceivable basis for why they might be attributed to a state actor. Plaintiff's Response does not address this issue. *See* Dkt. #17 at 17-18. The Court finds these deficiencies cannot be remedied through amendment. Accordingly, Plaintiff's § 1983 claims are properly dismissed with prejudice.

Plaintiff has likewise failed to state a claim under § 1985. Plaintiff alleges that personnel within Microsoft conspired to acquire employees' patents using the "false pretense" of employment agreements, which would entice employees to submit an Exclusion List ultimately disregarded by Microsoft. To state a cause of action under § 1985, Plaintiff must show that (1) "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action," and (2) the conspiracy was "aimed at interfering with rights that are protected against private, as well as official encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993) (internal citations omitted).

Plaintiff's claims provide no basis on which the Court may conclude that Microsoft's actions were motivated racial or class-based discriminatory animus. In fact, Plaintiff's complaint is devoid of *any* reference to racial or class-based discriminatory animus. *See generally* Dkt. #7. Instead, Plaintiff's allegations suggest that Microsoft's actions harm certain "types" of individuals: (i) employees engaged in creative services; (ii) employees with inventions subject to disclosure under the exclusion list; and/or (iii) employees aged forty and older, since older employees "likely will have more patents than the younger counterpart simply because inventions takes [sic] years to build." Dkt. #7 at ¶ 129. Plaintiff fails to explain how these groups of individuals constitute a "class" protected under § 1985. Moreover, his complaint makes clear that these groups of people are harmed simply because they have more patents for Microsoft to

claim—they are not targeted by Microsoft because of a specific animus against (i) creative people; (ii) people who attached inventions under the exclusion list; or (iii) employees over the age of forty.

In his Response, Plaintiff argues that he may assert an equal protection claim against Microsoft as a "class of one." Dkt. #17 at 19 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). However, *Olech* extended the Equal Protection Clause to instances where a plaintiff claims he was intentionally treated differently from others similarly situated and there was no rational basis for the disparate treatment. Nothing in Plaintiff's complaint supports a disparate treatment claim—on the contrary, he seeks certification of a class on the basis that his mistreatment is neither unique nor exceptional, but part of a broader patent-grabbing scheme by Microsoft against all of its employees with patents. *See* Dkt. #7 at ¶¶ 134-141. This deficiency makes amendment futile. *See Cordell v. Greater Columbia Reg'l Support Network*, No. CV-05-5119, 2006 WL 2354342, at *4 (E.D. Wash. Aug. 15, 2006) (Dismissing § 1985 claim with prejudice where Plaintiff "failed to make even the barest of allegations that the defendants' actions . . . are the offspring of a 'class-based invidiously discriminatory animus.'") Accordingly, Plaintiff's § 1985 claim is properly dismissed with prejudice.

**G. Fraud (Count 8)**

Plaintiff alleges that Microsoft either attempted or committed fraud by representing that employees may provide a written exclusion list of prior inventions and later informing Plaintiff that it could not find his Exclusion List. Dkt. #7 at ¶¶ 142-144.

Plaintiff's fraud claim is barred by the statute of limitations. In the state of Washington, an action claiming fraud must be commenced within three years upon "discovery by the aggrieved party of the facts constituting the fraud;" RCW 4.16.080(4). However, where a literal application of the statute of limitations "could result in grave injustice," courts apply a discovery rule of

accrual. *David v. Smith*, No. C19-898 MJP, 2019 WL 3842661, at *2 (W.D. Wash. Aug. 15, 2019) (quoting *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 158 Wn. 2d 566, 575 (2006), *as corrected* (Nov. 15, 2006) (internal quotations omitted). Under this discovery rule, the cause of action accrues either "when the plaintiff discovers, *or in the reasonable exercise of diligence should discover*, the elements of the cause of action." *Id.* (emphasis added).

Even if this Court liberally applies the discovery rule, Plaintiff's claims are untimely. Plaintiff asserts that May 27, 2016 was the first time that Microsoft provided a signed letter from outside counsel denying that Plaintiff had ever provided a list of inventions made by or belonging to him. Dkt. #7 at ¶ 49; *see also* Dkt. #17 at 20. Yet Plaintiff's complaint makes clear that by July 9, 2015 at the latest, he was aware of Microsoft's intention to deny existence of the Exclusion List. Plaintiff was first provided notice of Microsoft's alleged fraud as early as February 19, 2015 when Microsoft's in-house patent attorney notified him that "no inventions were listed by you [Mr. Khalid] for exclusion." Dkt. #7 at ¶ 40 (citing Dkt. #7-6 at 2). Over the next several months, Plaintiff continued to email Microsoft's in-house counsel regarding the Employment Agreement, including requests on April 14, 2015 and April 16, 2015 that Microsoft provide Plaintiff with a copy of the signed Employment Agreement. *Id.* at ¶ 43. Three months later, on July 9, 2015, Plaintiff claims that he declined an offer by Microsoft's in-house counsel to put together an agreement granting Microsoft a royalty-free license to the Mini-Cloud systems in exchange for resolving all disputes. *Id.* at ¶ 46. By this point, at the very latest, Microsoft had clearly indicated to Plaintiff its intention to deny the existence of the Exclusion List. Because Plaintiff did not file this action until January 28, 2019, the three-year limitations period had already expired.

Although the interests of justice require the pleadings of a pro se plaintiff to be liberally construed and held to less stringent standards, *Eldridge*, 832 F.2d at 1137, such interests also require plaintiffs to demonstrate diligence in pursuing their claims. *David*, 2019 WL 3842661, at

*3.  Here, Plaintiff was aware of the fraud nearly four years before he filed his complaint in January 2019.  Moreover, Plaintiff has provided no reason for the Court to further toll his fraud claim.  He contends that Microsoft "put no evidence on record that by February 2015, Khalid had a viable fraud claim", Dkt. #17 at 21, but the limitations period starts to run once the plaintiff "discovers the salient facts underlying the elements of the cause of action"—not when the plaintiff "learns that he or she has a legal cause of action . . . ."  *David*, 2019 WL 3842661, at *2. Microsoft's letter dated May 27, 2016 simply reiterated the company's previously-stated position that no Exclusion List existed.  Dkt. #7 at ¶ 49 (citing Dkt. #7-7 at 2).  The fact that this May 27, 2016 notice took the form of a signed letter from outside counsel—as opposed to an email from in-house counsel—added no facts to Plaintiff's fraud claim from what he already knew on February 19, 2015.  Because he has not demonstrated diligence in pursuing his claims, or that he was not at fault for the delay, his fraud claims are time-barred and dismissed with prejudice.

**H.  Declaratory Relief (Counts 9, 10, 11)**

Finally, Plaintiff seeks three declaratory judgments: (1) that the "right of first refusal" clause in Section 5 of the Employee Agreement violates RCW 49.44.140(1); (2) that the Employee Agreement violates the due process clause of the Fourteenth Amendment; and (3) that Microsoft engaged in "inequitable conduct" through its ambiguous and indefinite patent assignment provision.  As explained above with respect to Plaintiff's § 1983 claim, the Fourteenth Amendment only guards against *state* action—not private action.  *See Jackson v. Metropolitan*, 419 U.S. 345, 353 (1974).  In his response, Plaintiff misapplies the holding in *Tsao v. Desert Palace, Inc*.  *See* Dkt. #17 at 22 (citing 698 F.3d 1128, 1138 (9th Cir. 2012)) (affirming private entities may be sued under § 1983).  *Tsao* in no way removed the fundamental requirement that a private party's actions somehow be attributable to the state.  *See id.* at 1139 ("§ 1983 makes liable only those who act under color of state law") (internal quotations omitted).  Because

Plaintiff's complaint fails to allege a viable Fourteenth Amendment claim, Plaintiff's claim for declaratory judgment under Count 10 is properly dismissed with prejudice. The Court will address the remaining two claims regarding RCW 49.44.140(1) and the general inequitable conduct of Microsoft.

The Declaratory Judgment Act ("DJA") authorizes a district court to "declare the rights and other legal relations of any interested party seeking such declaration" when there is an "actual controversy." 28 U.S.C. § 2201(a). To have subject matter jurisdiction over a claim brought under the DJA, there must be an "actual controversy." *See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,* 482 F.3d 1330, 1338. An "actual controversy" under the DJA is the same as an Article III case or controversy. *See id.* A party bringing a declaratory judgment claim must therefore show "that under 'all the circumstances,' there is an actual or imminent injury that was caused by the opposing party, is redressable by judicial action, and is of 'sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Multimedia Patent Tr. v. Microsoft Corp.*, 525 F. Supp. 2d 1200, 1218 (S.D. Cal. 2007) (internal citation omitted). Even if an actual controversy exists, the Court may decline to issue a declaratory judgment. *Weyerhaeuser Co. v. Novae Syndicate 2007,* No. C18-0585-JLR, 2019 WL 3287893, at *1 (W.D. Wash. July 22, 2019) ("Even where the Article III requirement of an actual controversy is satisfied, the district court's exercise of its declaratory judgment authority is discretionary.") (Citing *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222-23 (9th Cir. 1998)).

Plaintiffs remaining claims for declaratory relief are properly dismissed without prejudice. First, Plaintiff's request for declaratory judgment that the "right of first refusal" clause in Section 5 violates RCW 49.44.140 is not ripe for adjudication. This clause provides as follows:

> In addition to the rights provided to MICROSOFT under paragraph 6 below, as to any Invention complying with 5(a)-(c) above that results in any product, service or development with potential commercial application, MICROSOFT shall be given

the right of first refusal to obtain exclusive rights to the Invention and such product, service or development . . . .

Dkt. #7-1 at 2-3. The Court agrees with Microsoft that Plaintiff has not alleged an actual case or controversy arising from Microsoft attempting to enforce the "right of first refusal" clause. *See* Dkt. #14 at 21. Instead, Plaintiff's dispute with Microsoft appears to arise from parties' disagreement over whether he submitted an Exclusion List under Section 6 of the Employee Agreement. *Id.* at ¶ 151; *see also id.* at ¶¶ 182-199 (damages sought by Plaintiff). Because Plaintiff's facial challenge to the legality of the "right of first refusal" clause under Section 5 is not tied to any actual dispute between the parties and does not rest an any concrete injury that is cognizable, it is not ripe for adjudication. *See Lee v. Capital One Bank*, No. C07-4599-MHP, 2008 WL 648177, at *4 (N.D. Cal. Mar. 5, 2008) ("Plaintiff's claim does not present a "Case" or "Controversy" because the allegedly unconscionable provisions in the Agreement have not been implicated in an actual dispute."); *see also Lee v. Am. Express Travel Related Servs.*, No. C 07-04765-CRB, 2007 WL 4287557, at *5 (N.D. Cal. Dec. 6, 2007) (Denying standing where plaintiffs claimed injury by mere existence of unconscionable terms in contract, but terms not implicated in actual dispute).

Finally, Plaintiff's request for declaratory judgment that Microsoft engaged in "inequitable conduct" is also unripe for adjudication. The broad and vague declaratory relief sought by Plaintiff does not "admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41 (1937) (internal quotations omitted). Even if the Court narrows the broad language of Plaintiff's request to apply to Microsoft's use and enforcement of its Employment Agreement, Plaintiff has failed to sufficiently allege an actual dispute suitable for declaratory relief for the same reasons set forth above. On amendment,

Plaintiff's complaint must request specific relief from the Court based on his own dispute with Microsoft—not broad relief based on hypothetical injuries to other Microsoft employees.

**I. Leave to Amend**

Plaintiff shall be granted leave to amend his complaint so that he may be afforded an additional opportunity to plead a viable claim under the Sherman Act (Counts 1, 2), RICO (Count 3) and/or declaratory relief under Counts 9 and 11. The claims shall be made on his own behalf and not on behalf of a putative class of plaintiffs. The amended complaint shall contain a concise statement of his claims setting forth the specific facts giving rise to a plausible inference that Microsoft is liable for the alleged violations. Plaintiff shall file an amended complaint within thirty (30) days from the date of this Order. Failure to comply with this Order will result in dismissal of the action.

## IV.  CONCLUSION

Having reviewed Defendant's Motion, Plaintiff's Response, Defendant's Reply, and the remainder of the record, it is hereby ORDERED:

(1) Defendant's Motion to Dismiss, Dkt. #14, is GRANTED;

(2) Counts 1 and 2 (Sherman Act claims) and Count 3 (RICO claim for extortion) are DISMISSED without prejudice and with leave to amend;

(3) Count 4 (forced labor), Count 5 (RICO claim for forced labor), Counts 6 and 12 (civil rights claims), and Count 8 (fraud) are DISMISSED with prejudice;

(4) Plaintiff's claim for declaratory relief on Fourteenth Amendment violation (Count 10) is DISMISSED with prejudice. Plaintiff's remaining claims for declaratory relief (Counts 9 and 11) are DISMISSED without prejudice and with leave to amend;

(5) Plaintiff is ORDERED to file a Second Amended Complaint within thirty (30) days of this Order for Counts 1–3, 9 and 11.

DATED this 4 day of September, 2019.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE