1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

ATM SHAFIQUL KHALID, an individual
and on behalf of similarly situated,
XENCARE SOFTWARE, INC.,

10

                            Plaintiff,

11

        v.

12

13

MICROSOFT CORP., a Washington
Corporation, and JOHN DOE *n*,

14

                            Defendants.

15

CASE NO. C19-130-RSM

ORDER GRANTING
DEFENDANT MICROSOFT
CORPORATION'S MOTION TO
DISMISS

16

## I.      INTRODUCTION

17

This matter comes before the Court on Defendant Microsoft Corporation ("Microsoft")'s

18

Motion to Dismiss Plaintiff ATM Shafiqul Khalid's Second Amended Complaint.  Dkt. #32.

19

The Court finds oral argument unnecessary to resolve the underlying issues.   Having

20

reviewed Defendant's Motion, Plaintiff's Response, Defendant's Reply, and the remainder of

21

the record, the Court GRANTS Defendant's Motion to Dismiss and dismisses Plaintiff's

22

claims  with prejudice and without leave to amend.

23

## II.      BACKGROUND

24

On September 4, 2019, this Court dismissed Plaintiff's First Amended Complaint.  Dkt.

#20. The Court granted Plaintiff leave to amend three of his claims: Counts 1 and 2 under the Sherman Act, and Count 3 under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Id.* at 22. The Court also granted Plaintiff leave to amend two of his requests for declaratory relief, Counts 9 and 10. The remainder of Plaintiff's claims were dismissed with prejudice and without leave to amend. *Id.* On November 29, 2019, Plaintiff filed the Second Amended Complaint. Dkt. #29. Microsoft's Motion to Dismiss seeks dismissal of Plaintiff's remaining claims with prejudice. Dkt. #32 at 17.

Plaintiff's Second Amended Complaint ("SAC") provides many of the same facts asserted in his First Amended Complaint. After accepting a position with Microsoft as a Senior Program Manager in its Bing division, Plaintiff signed Microsoft's Employee Agreement (the "Employee Agreement"). Dkt. #29 at ¶¶ 14-16. This agreement included a provision under Section 5 that assigned to Microsoft all rights, title and interest in all inventions that the employee "may conceive, develop, reduce to practice or otherwise produce" during his employment with Microsoft. Dkt. #29-1 at 2-3. Section 6 of the Employee Agreement asked Plaintiff to attach a list "describing all Inventions belonging to me and made by me prior to my employment with MICROSOFT that I wish to have excluded from this Agreement. If no such list is attached, I represent that there are no such Inventions." Dkt. #29 at ¶ 16. The Employment Agreement further noted on its first page: "If you wish to attach a list of inventions, per paragraph 6, below, please contact your recruiter." *Id.* at ¶ 14.

Plaintiff signed the Employee Agreement on December 19, 2011 and sent a separate email to his recruiter, Shannon Carlsen, attaching an invention exclusion list (the "Exclusion List") that listed nine patentable items. *Id.* at ¶¶ 17-19. This Exclusion List included inventions for a mini-cloud subscription service ("the '637 patent") and a framework to protect computer systems from viruses and spyware ("the '219 patent") that he had filed prior to starting work at Microsoft. *Id.*

at ¶¶ 19-20; Dkt. #29-5.  At his Microsoft employee orientation program in January 2012, Plaintiff signed a hard copy of the Employee Agreement, submitted his Exclusion List for the second time and noted by hand in the hard copy Employee Agreement that he submitted additional pages.  *Id.* at ¶ 18.  Plaintiff worked at Microsoft from January 9, 2012 until his termination in early February 2015.  *Id.* at ¶ 22.

On February 19, 2015, Microsoft's in-house counsel notified Plaintiff that he had not listed any inventions under Section 6 of the Employment Agreement.  *Id.* at ¶¶ 44-45.  For that reason, in-house counsel stated, Microsoft retained an assignment right in the patents for the '637 and '219 patents.  Plaintiff claims that Microsoft continued to deny receipt of his Exclusion List, despite Plaintiff's requests to various employees for hard copies of his signed Employee Agreement.  *Id.* at ¶¶ 46-51.  On July 9, 2015, Microsoft offered to put together an agreement if Plaintiff "agreed to give Microsoft royalty free access to all present and future patents related to the Mini-cloud systems in exchange for resolving all disputes."  *Id.* at ¶ 50.  Plaintiff declined this offer on the basis that it was unfair and anti-competitive.

On May 27, 2016, Plaintiff received a letter from Microsoft's outside counsel, Merchant & Gold.  This 2016 letter ("the M&G letter") re-stated Microsoft's position that Plaintiff had granted Microsoft a "royalty-free license, irrevocable, worldwide license" to those inventions.  *Id.* at ¶ 53 (quoting Dkt. #29-7 at 4).  Outside counsel offered to transfer to Plaintiff all of Microsoft's ownership interest in the '219 and '637 patent families in exchange for his granting Microsoft a non-exclusive, royalty-free license to the disputed patent families and fully releasing Microsoft from all claims and liability.  *Id.*

Plaintiff claims that Citrix Systems, Inc. ("Citrix"), a Microsoft vendor that employed Plaintiff before he began working at Microsoft, took part in issuing the May 2016 M&G letter. Dkt. #29 at ¶ 178.  Plaintiff had sued Citrix in state court in October 2015 in an effort to clear title

to the '219 and '637 patents, which Citrix had also attempted to claim. *Id.* at ¶ 56. On August 1, 2018, the state court entered a $5.8 million judgement in favor of Plaintiff against Citrix. *Id.* at ¶ 62. Plaintiff maintains that during the state court trial, a chief architect of Citrix "testified and suggested that Citrix wanted to protect its partner and suggested that Khalid's patent could have been hostile to those partners. [The chief architect] also testified that Citrix never sold anti-virus kind of products, an area 219 patent targeted to solve." *Id.* at ¶ 60.

Plaintiff's Second Amended Complaint alleges that Microsoft, acting in concert with its vendor, Citrix, engaged and continues to engage in a patent-grabbing scheme through its patent rights assignment provision in the Employee Agreement. *Id.* at ¶¶ 69-79. He maintains that Microsoft fraudulently denied the existence of his exclusion list, *id.*, and that Citrix acted in concert with Microsoft to cloud Plaintiff's patent title and threaten him with baseless litigation. *Id.* at ¶¶ 111-112, 131, 178. Plaintiff claims that Microsoft's scheme violates antitrust laws under Sections 1 and 2 of the Sherman Act and the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Id.* at ¶¶ 96-114. He also seeks declaratory relief that the Employee Agreement violated RCW 49.44.140 and that Microsoft engaged in inequitable conduct. *Id.* at ¶¶ 151-157.

### III.    DISCUSSION

#### A. Legal Standard

In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as true and makes all inferences in the light most favorable to the non-moving party. *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted). However, the court is not required to accept as true a "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678. This requirement is met when

the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint need not include detailed allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Absent facial plausibility, a plaintiff's claims must be dismissed. *Id.* at 570. Because Plaintiff is proceeding pro se, his pleadings must be liberally construed. *Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987).

**B. Claims Previously Dismissed with Prejudice and Surreply**

As an initial matter, Plaintiff has improperly used his Second Amended Complaint to re-plead claims dismissed with prejudice and without leave to amend. *See* Dkt. #29 at ¶¶ 120-124 (RICO claim predicated on forced labor); ¶¶ 125-132 (civil rights claims); ¶¶ 141-150 (fraud); and ¶¶ 158-179 (declaratory relief for Fourteenth Amendment violations). The Court instructed Plaintiff in its initial order of dismissal, Dkt. #20, and again in its order denying Plaintiff's motion for reconsideration, Dkt. #28, that he was not granted leave to amend these claims. The Court will not reconsider them here. Similarly, Plaintiff has renewed his request that he represent a class of all Microsoft employees who signed an employment contract with Microsoft similar to the Employee Agreement that he signed. Dkt. #29 at ¶¶ 133-140. The Court has already addressed this issue and will not reconsider it here. *See* Dkt. #20 at 6-7.

Plaintiff also filed a surreply, Dkt. #36, but provided no notice to the Court as required by this district's Local Rules. *See* Local Rules W.D. Wash. LCR 7(g)(1). While pro se parties are generally held to less stringent standards, a pro se litigant must follow the same rules of procedure that govern other litigants. *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995). Moreover, Plaintiff has improperly used the surreply to pose the same or additional arguments in opposition to the Motion to Dismiss. Microsoft's reply brief does not raise new arguments, but merely reiterates

the grounds for dismissal asserted in its opening brief. Therefore, the court will not consider the surreply in resolving the motion and hereby strikes it.

**C. Sherman Act Section 1 Claims**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 1. To state a claim under Section 1, a plaintiff must allege (1) a contract, combination, or conspiracy between two or more entities; (2) in unreasonable restraint of trade; that (3) affects interstate commerce. *See id.*; *Am. Ad. Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 788 (9th Cir. 1996). Here, Plaintiff identifies three "agreements" entered into by Microsoft that allegedly violated Section 1: (a) the Employee Agreement; (b) the vendor agreement with Citrix; and (c) the 2016 M&G letter from Microsoft's outside counsel, either on its own or in combination with the Citrix vendor agreement. Dkt. #29 at ¶¶ 98-102.

1. Actionable Conspiracy

Microsoft contends that Plaintiff has failed to state an actionable conspiracy with respect to the Employee Agreement because there can be no conspiracy between the parties to the agreement—here, Plaintiff and Microsoft. Dkt. #32 at 10-11. The Court agrees. The Court has previously considered and dismissed Plaintiff's theory that the Employee Agreement may violate Section 1. Dkt. #20 at 7 ("It is well-established that Section 1 of the Sherman Act does not reach "wholly unilateral" conduct by a single entity) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (internal quotations omitted)). Plaintiff responds that the Employee Agreement is not subject to the single entity rule because, as a potential competitor of Microsoft, he "didn't have economic unity" with his employer. Dkt. #34 at 10 (citing *Freeman v. San Diego Ass'n of Realtors,* 322 F.3d 1133, 1147 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003)).

Plaintiff's argument to preserve his Section 1 claim as to the Employee Agreement is difficult to follow and appears to contradict the gravamen of his complaint. Although courts recognize exceptions to the "single entity" principle generally applied to intra-company agreements, such an exception applies to situations where an individual is acting as a co-conspirator with the corporation because of his "independent personal stake" in the conspiracy's success. *American Needle, Inc. v. National Football League*, 560 U.S. 183, 200 (2010) ("Agreements within a firm can constitute concerted action covered by § 1 when the parties to the agreement act on interests separate from those of the firm itself, and the intrafirm agreements may simply be a formalistic shell for ongoing concerted action."). Setting aside the logical fallacy of Plaintiff's argument, the SAC makes clear that he does not intend to claim that he was in conspiracy with Microsoft nor that he derived any benefit from the Employee Agreement—indeed, he alleges the very opposite. *See, e.g.*, Dkt. #29 at ¶¶ 99-100. Accordingly, Plaintiff's Section 1 claim as to the Employee Agreement again fails to state an actionable conspiracy.

### 2. Unreasonable Restraint of Trade

Turning to the remaining two "agreements," the Citrix vendor agreement and the May 2016 M&G letter, Microsoft argues that Plaintiff has failed to allege an unreasonable restraint of trade as to any agreements between Microsoft and Citrix. Dkt. #32 at 12. A Section 1 plaintiff must sufficiently plead a restraint of trade that falls under one of three rules of analysis: rule of reason, per se, or quick look. While courts typically need not decide which standard to apply at the pleading stage, they must still determine whether the complaint has alleged sufficient facts to state a claim under at least one of these three rules. *See In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) ("Indeed, that decision is more appropriate on a motion for summary judgment.").

The rule of reason is the presumptive, default standard and "requires the antitrust plaintiff to demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011). This rule requires a court to examine a variety of factors such as information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history and effect. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Next, a small category of restraints are considered illegal per se because "they always or almost always tend to restrict competition and decrease output." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). Because per se agreements are so "manifestly anticompetitive" and lacking in "any redeeming virtue," the detailed industry analysis required under the rule of reason is not required for per se restraints. Finally, the "quick look" analysis applies to a certain class of restraints that is "not unambiguously in the per se category" but "may require no more than cursory examination to establish that their principle or only effect is anticompetitive." *Safeway, Inc.*, 651 F.3d at 1133. Under the quick look analysis, courts conduct a "truncated rule of reason" analysis if the anticompetitive effects on customers and markets are clear in the absence of a detailed market analysis. *Id.*

Microsoft argues that the rule of reason applies and that Plaintiff has failed to allege restraint of trade under this standard. Dkt. #32 at 12. Plaintiff responds that both agreements are either per se Section 1 violations or restraints of trade under the quick look approach, and he is therefore relieved from having to plead injury to competition. Dkt. #34 at 16. It is well-established that a plaintiff is not required to plead under all three possible rules. *United States v. eBay, Inc.*, 968 F.Supp.2d at 1030, 1037–38 (2013) ("A plaintiff is the master of its complaint and may choose which claims to allege. The strategy of alleging only per se and quick look violations is not an unprecedented one."). However, a plaintiff must be prepared to "abide by the consequences of its pleading decisions," which includes risk of dismissal. *Id.* at 1038.

To the extent Plaintiff attempts to assert "per se" violations of the Sherman Act, he fails to allege sufficient facts to support this theory. It is not apparent that either the vendor agreement or the M&G letter have "manifestly anticompetitive effects," or that they "lack any redeeming virtue." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011). The M&G letter applies to Plaintiff alone without any application to other competitors in the market. The vendor agreement's "anticompetitive effect" is likewise unclear. This agreement claims all intellectual property produced by Citrix's employees during their employment with Citrix and transfers it to Microsoft. Dkt. #29 at ¶ 54. Plaintiff has failed to direct the Court to any cognizable per se restraint of trade contained therein. *Cf. United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) (per se violations include horizontal agreements among competitors to fix prices or divide markets, group boycotts, tying arrangements, and output limitations).

Plaintiff responds that Citrix and Microsoft's intellectual property agreements equate to "naked price-fixing" because their claims clouded title to his patents and reduced their value to zero. Dkt. #29 at ¶ 99; Dkt #34 at 8. Accepting these claims as true, the Court still finds no support for Plaintiff's theory that clouding his patent title—even in bad faith—equates to one of the four price-fixing arrangements recognized under antitrust law. *Cf. Knevelbaard Dairies v. Kraft Foods, Inc.* 232 F.3d 979. 988 (9th Cir. 2000) (Describing the four types of price-fixing arrangements: horizontal minimum price-fixing, horizontal maximum price-fixing, vertical minimum price-fixing, and vertical maximum price-fixing).

Similarly, Plaintiff has alleged insufficient facts to support a "quick look" analysis of his claims. Under quick look, a court must be able to determine that an agreement has anticompetitive effects from the perspective of an observer "with even a rudimentary understanding of economics." *Harris,* 651 F.3d at 1138. Without any attempt by Plaintiff to provide market analysis, the Court cannot find that an intellectual property transfer agreement between Citrix and

Microsoft has obvious anticompetitive effects. *Safeway, Inc.*, 651 F.3d at 1133. In addition to Plaintiff's "naked price-fixing" argument considered and rejected above, he contends that these agreements are subject to quick look because they violate the "constitutional policy" under Article 1, Section 8, Clause 8 "to provide an incentive to inventors to promote the Progress of Science and useful Arts." Dkt. #34 at 16. This constitutional argument offers no explanation for why the vendor agreement or the M&G letter should be subject to quick look rather than rule of reason.

In sum, Plaintiff has failed to sufficiently plead the existence of restraints that are subject to either per se or quick look analysis. More fatally, because he attempted to avoid pleading anticompetitive effects, he failed to plead these restraints under the rule of reason. *See* Dkt. #34 at 16-17. To state a Section 1 claim under the rule of reason, plaintiffs must plead facts which, if true, will prove "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). Additionally, plaintiffs must plead that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an "anti-competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990). This fourth element is generally referred to as "antitrust injury" or "antitrust standing." *See, e.g., id.*

Plaintiff has failed to plead actual injury to competition and antitrust standing. To allege actual injury to competition, a plaintiff must plead facts that, if true, would show that the agreement adversely affects competition in the relevant market as a whole—not just the plaintiff. *Twombly*, 550 U.S. at 556. To sufficiently allege antitrust injury, the plaintiff must not only allege that the defendant's behavior is anticompetitive, but that his injury is *because of* the anti-

competitive aspect of the practice. *Brantley*, 675 F.3d at 1200 (citing *Atl. Richfield Co.*, 495 U.S. at 334). Plaintiff's complaint only describes injuries to himself with no mention of actual harm to competition. *See* Dkt. #29 at ¶ 102 ("The restraint restricted Khalid from developing his patents furthers causing damage to his IP licensing and incubation business in 2015/2016 and negatively impacted Khalid's recovery from Microsoft partner Citrix along with added litigation cost."). Because Plaintiff has failed to sufficiently plead injury to competition, he cannot show that his injury is because of any anticompetitive conduct. For that reason, he has likewise failed to plead antitrust standing.

Accordingly, Plaintiff has failed to state a claim under Section 1 as to the Employee Agreement, the vendor agreement with Citrix, or the M&G letter.

### 3. *Walker Process* Claim

Plaintiff also claims that Microsoft threatened baseless litigation in violation of Section 1. *Id.* at ¶ 101. It is "well-established" in antitrust law that using baseless litigation to drive out competition may amount to an antitrust violation. *Int'l Techs. Consultants, Inc. v. Pilkington PLC*, 137 F.3d 1382, 1390 (9th Cir. 1998) (citing *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842 (1st Cir. 1985)). Microsoft acknowledges that this type of claim, known as a *Walker Process* claim, is cognizable, but counters that Plaintiff "makes no plausible allegation that Microsoft sent its letter in bad faith, or that it knew its claim was baseless." Dkt. #35 at 7.

The Court agrees. Plaintiff has undermined his bad faith claim by acknowledging that Microsoft may have misplaced his Disclosure List due to negligent bookkeeping rather than as part of an intentional, fraudulent scheme. *See* Dkt. #29 at ¶ 83 ("The M&G letter and Miki's case show either irreparable and costly neglect in Microsoft's applicant/new employee document bookkeeping, or show a blatant cover-up"). Moreover, nothing in the M&G letter suggests a threat of litigation—it notifies Plaintiff that Microsoft disputes his patent claims, it asserts

Microsoft's patent rights, and it offers settlement. *See* Dkt. #29-7 at 2-5. On this basis, Plaintiff has failed to state a *Walker Process* claim. *See K-Lath, Div. of Tree Island Wire (USA), Inc. v. Davis Wire Corp.*, 15 F. Supp. 2d 952, 956–57, 964 (C.D. Cal. 1998) (dismissing *Walker Process* claim where defendants reserved their rights but did not actually threaten suit).

**D. Section 2 Sherman Act Claims**

Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . [commits a felony]." 15 U.S.C. § 2. To state a claim for monopolization under this provision, a plaintiff must allege that the defendant (1) possessed monopoly power in the relevant markets; (2) willfully acquired or maintained its monopoly power through exclusionary conduct; and (3) caused antitrust injury. *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997). To state a claim for attempted monopolization, a plaintiff must allege (1) specific intent to control process or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power" and (4) causal antitrust injury. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432–1433 (9th Cir. 1995).

Here, Plaintiff claims that through Microsoft's Employee Agreement, its vendor agreement with Citrix, and its ability to pay no development cost of the '637 patent to Plaintiff, Microsoft attempted to gain or maintain its monopoly in the patent submarket attached to the '637 patent. He specifies that Microsoft sought to retain "100% market power within the $4 billion sub-market attached to the '637 patent." Dkt. #29 at ¶ 105. Microsoft argues that dismissal of Plaintiff's Section 2 claim is warranted because he has again failed to adequately allege maintenance of or a dangerous probability of Microsoft achieving monopoly power. Dkt. #32 at

12-13.  Microsoft also argues that obtaining Plaintiff's patent does not equate to Microsoft

obtaining power *in the relevant market*.  *Id.* at 13.

The Court agrees that the SAC's added references to a $4 billion market for the '637 patent

within a broader $400 billion cloud/gaming market fail to remedy the defects the Court identified

in his previous complaint.  *See* Dkt. #29 at ¶¶ 104-105.  Plaintiff has again only alleged market

share without providing market analysis (e.g., barriers to entry or hyper-competitive pricing) or

allegations that Microsoft willfully acquired or maintained monopoly power within the submarket

rather than as a consequence of superior product, business acumen, or historical accident.  *See*

Dkt. #20 at 8.  Plaintiff responds that ownership of the '637 patent equates to a monopoly within

the patent's submarket.  Dkt. #34 at 12 (citing *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2011)).

However, nothing in *Actavis* contradicts the well-recognized principle that economic market

power cannot be inferred from the mere fact that one holds a patent.  *See Ill. Tool Works Inc. v.

Indep. Ink, Inc.*, 547 U.S. 28, 43, n.4 (2006).  For this reason, even though Plaintiff alleged

Microsoft's intent to acquire his patent rights, an intent to acquire patent rights does not

automatically equate to an intent to monopolize or attempt to monopolize a particular market.

*See id.* at 45–46 ("[A] patent does not necessarily confer market power upon the patentee.")

Lastly, Plaintiff has failed to allege injuries within the scope of antitrust injury

contemplated by Section 2.  *See* Dkt. #20 at 9 (citing *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of

California*, 190 F.3d 1051, 1055 (9th Cir. 1999) ("[T]he antitrust laws are only intended to

preserve competition *for the benefit of consumers*.") (emphasis added)).  Similar to his First

Amended Complaint, Plaintiff describes how Microsoft's conduct has reduced the value of *his*

patents and prevented *him* from entering the market, *see* Dkt. #29 at ¶ 105, but he has failed to

plausibly link Microsoft's conduct or his own injury to an injury to competition within the

identified markets or to consumer welfare.  For these reasons, dismissal is warranted.

## E. Racketeering Claims under 18 U.S.C. § 1962

Plaintiff also alleges civil RICO violations through extortion. *See* Dkt. #29 at ¶¶ 106-114. To plead a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Howard v. America Online, Inc.*, 208 F.3d 741 (9th Cir. 2000). A "pattern of racketeering activity" requires at least two predicate acts to constitute racketeering activity. *See* 18 U.S.C. §1961(5). Microsoft challenges Plaintiff's RICO claim for failure to sufficiently allege an enterprise and predicate acts as well as a failure to meet the heightened pleading requirements for wire fraud. Dkt. #32 at 13-15. The Court will first address enterprise.

### 1. Enterprise

Section 1962(c) targets conduct by "any person employed by or associated with any enterprise . . . ." "This expansive definition is 'not very demanding." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Odom v. Microsoft*, 486 F.3d 541, 548 (9th Cir. 2007)). An enterprise that is not a legal entity is commonly known as an "association-in-fact" enterprise and does not require "any particular organizational structure, separate or otherwise." *Odom*, 486 F.3d at 551. To plead the existence of an association-in-fact enterprise, a plaintiff must allege (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle*, 556 U.S. at 946. Microsoft argues that the Second Amended Complaint fails to allege the first and third factors. Dkt. #32 at 13-15.

Here, Plaintiff claims that Citrix and Microsoft associated together for the common purpose of "taking ownership" of Plaintiff's '219 and '637 patents through a racketeering scheme. Dkt. #29 at ¶ 108. Microsoft counters that such allegations are "paper-thin" and insufficient to plausibly allege an association for the purpose of appropriating the Mini-Cloud and Safe and

Secure patents. Dkt. #32 at 14. While the Court acknowledges the thin allegations in Plaintiff's Complaint, the Court disagrees that Plaintiff has failed to allege a common purpose. Construed liberally, the Complaint sets forth Plaintiff's theory that Citrix and Microsoft associated to obtain employees' patents through fraudulent means, which is sufficient to state a common purpose. *Odom,* 486 F.3d at 552 (finding associated-in-fact enterprise where "Microsoft and Best Buy had a common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means.").

However, the Court agrees that Plaintiff has failed to sufficiently plead the ongoing relationship between Citrix and Microsoft that is necessary to establish an "association-in-fact." The Complaint provides no facts on when Microsoft and Citrix formed the vendor relationship, how long they have maintained this relationship, nor how this timeline corresponds to the alleged predicate acts. Because the alleged predicate acts span a nine-year period from 2009 to 2018, *see* Dkt. #29 at ¶ 109, the dearth of information as to the alleged Citrix-Microsoft enterprise relationship make it impossible for the Court to determine whether the relationship was in place at the time any or all of the alleged predicate acts occurred. Plaintiff has likewise failed to provide specific facts as to its organization, such as how one company may control, direct, or manage the other, thus leaving the Court to guess the structure of the alleged enterprise. *See Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1089 (N.D. Cal. 2013) ("No specific factual allegations explain how [the scheme] occurs, and without this information, the Court cannot ascertain the structure of the alleged enterprise."). For these reasons, Plaintiff has failed to sufficiently allege an enterprise.

2. Predicate Acts

Plaintiff has also failed to allege the predicate acts necessary to sustain a RICO claim. Plaintiff claims that several of Microsoft's actions constitute extortion under either the Hobbs Act

or extortion in the second degree under the Washington Racketeering Act, RCW 9A.56.130. Dkt. #29 at ¶¶ 3-4. The Hobbs Act defines extortion as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b). The "obtaining" element "requires a showing that a defendant received something of value from the victim of the alleged extortion and that the "thing of value can be exercised, transferred, or sold." *United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009). Washington law defines "extortion" as "knowingly to obtain or attempt to obtain by threat [the] property or services of the owner . . . ." RCW 9A.56.110. Extortion in the second degree means "extortion by means of a wrongful threat . . . ." RCW 9A.56.130.

None of the six predicate acts listed in the complaint state a claim for extortion under either the Hobbs Act or Washington law. These acts include (1) Microsoft initiating a lawsuit against Miki Mullor, which ended in settlement; (2) the May 27, 2016 M&G letter asserting Microsoft's patent rights; (3) Citrix withholding severance money; (4) Citrix threatening litigation; (5) objections to discovery requests; and (6) Citrix refusing Plaintiff's $50,000 patent licensing offer. Dkt. #29 at ¶ 109. Plaintiff argues that the "property" the enterprise sought to obtain was his (and Mullor's) patent rights. Yet none of these alleged actions entail Microsoft or Citrix obtaining Plaintiff's patent rights with his consent through force, fear, or threats as required under 18 U.S.C. § 1951(b); *see also McFall*, 558 F.3d at 956.

Plaintiff argues that these actions constitute "wrongful threats" under the Washington Racketeering Act because Microsoft and/or Citrix sought to use these threats to substantially harm his business or financial condition in order to procure his patent rights. Dkt. #34 at 18-19. However, regardless of what Washington law labels "extortion," an act "cannot qualify as a predicate offense for a RICO suit unless it is capable of being generically classified as extortionate." *Wilkie v. Robbins,* 551 U.S. 537, 567 (2007) (internal quotation marks and citation

omitted). Under both the Hobbs Act and the generic definition, actual or threatened fear of financial loss must be "wrongful" to be extortionate. *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 843 (9th Cir. 2014).

Here, the SAC makes clear that Microsoft's asserted rights over the '219 and '637 patents, including those stated in the M&G letter, were based on its understanding of the Employee Agreement. Dkt. #29 at ¶ 53. The SAC likewise makes clear that Plaintiff signed this agreement when he began working at Microsoft. *See id.* at ¶¶ 14-18. The gravamen of Plaintiff's lawsuit is that he submitted an Exclusion List under this legal agreement and that Microsoft now falsely denies its existence. This issue, which concerns the interpretation and application of the Employee Agreement to Plaintiff's patent rights, amounts to a contract dispute—particularly given Plaintiff's acknowledgement that Microsoft may have lost his Disclosure List due to negligent bookkeeping, not because of intentional fraud. *See, e.g., Union Nat'l Bank of Little Rock v. Federal Nat'l Mortgage Association,* 860 F.2d 847, 857 (8th Cir.1988) (holding that regardless of whether the defendant actually had a right to monies claimed, defendant's demands "were motivated by [the defendant's] interpretation of the agreement" and therefore not extortion). Regardless of whether Microsoft actually had a right to the patents, its demands were based on its understanding of its rights under the Employee Agreement and therefore cannot amount to a "wrongful threat" for purposes of a RICO claim.

This leaves wire fraud as the only remaining predicate act. Plaintiff contends that Microsoft committed wire fraud by falsely representing that he could submit the Exclusion List and by sending the M&G letter, which falsely claimed that he never submitted an Exclusion List. Dkt. #29 at ¶ 112. Wire fraud under 18 U.S.C. § 1343 requires (1) the formation of a scheme to defraud; (2) the use of the mails or wires in furtherance of that scheme; and (3) the specific intent to defraud. *Eclectic Props. E. v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).

1    Plaintiff must also satisfy the heightened pleading standards for fraud under Rule 9(b).  *Schreiber*

2    *Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

3         Because Plaintiff has conceded that the missing Disclosure List may be the product of

4    negligent bookkeeping, *id.* at ¶ 83, he cannot plausibly allege that Microsoft had a specific intent

5    to defraud him—let alone every employee who signs the agreement.  Moreover, Plaintiff has

6    failed to allege formation of a scheme to defraud its employees.  While he states with particularity

7    the events leading to Microsoft's denial of his own Exclusion List, *see id.* at ¶¶ 17-18, 53-54, the

8    only facts he provides beyond his own dispute with Microsoft are vague allegations related to

9    another former Microsoft employee, Miki Mullor.  *See id.* at ¶¶ 82-84.  The Court finds these

10   claims insufficient to reasonably infer that Plaintiff's and (possibly) Mullor's disputes with

11   Microsoft comprise part of a larger scheme by Microsoft to defraud any employee who submits

12   a Disclosure List with their Employee Agreement.

13        Plaintiff also brings claims under Section 1962(d) for conspiring to violate RICO.  Dkt.

14   #29 at ¶ 114.  Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to

15   violate any of the provisions of subsection (a), (b), or (c) of this section."  "To establish a violation

16   of section 1962(d), a plaintiff must allege either an agreement that is a substantive violation of

17   RICO or that the defendants agreed to commit, or participated in, a violation of two predicate

18   offenses." *Howard v. America Online Inc.,* 208 F.3d 741, 751 (9th Cir. 2000).  Because Plaintiff

19   has failed to allege the requisite substantive elements of RICO under Section 1962(c), his claim

20   for conspiracy under Section 1962(d) also fails.  *See id.* (A plaintiff's failure to adequately plead

21   substantive violation of RICO precludes a claim for conspiracy).

22   **F.  Declaratory Relief**

23        Finally, Plaintiff seeks two declaratory judgments: (1) that the "right of first refusal"

24   clause in Section 5 of the Employee Agreement violates RCW 49.44.140(1); and (2) that

Microsoft engaged in "inequitable conduct" through its ambiguous and indefinite patent assignment provision.

The Declaratory Judgment Act ("DJA") authorizes a district court to "declare the rights and other legal relations of any interested party seeking such declaration" when there is an "actual controversy." 28 U.S.C. § 2201(a). To have subject matter jurisdiction over a claim brought under the DJA, there must be an "actual controversy." *See Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.,* 482 F.3d 1330, 1338. An "actual controversy" under the DJA is the same as an Article III case or controversy. *See id.* A party bringing a declaratory judgment claim must therefore show "that under 'all the circumstances,' there is an actual or imminent injury that was caused by the opposing party, is redressable by judicial action, and is of 'sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Multimedia Patent Tr. v. Microsoft Corp.*, 525 F. Supp. 2d 1200, 1218 (S.D. Cal. 2007) (internal citation omitted). Even if an actual controversy exists, the Court may decline to issue a declaratory judgment. *Weyerhaeuser Co. v. Novae Syndicate 2007,* No. C18-0585-JLR, 2019 WL 3287893, at *1 (W.D. Wash. July 22, 2019).

The Court previously found that Plaintiff failed to allege an actual case or controversy arising from Microsoft attempting to enforce the "right of first refusal" clause. *See* Dkt. #20 at 21. Nothing in Plaintiff's Second Amended complaint remedies this deficiency. Plaintiff argues that Microsoft invoked the right of first refusal when he approached them first before he tendered his patents to Google. Dkt. #34 at 22. However, his complaint makes clear that Microsoft never invoked the right of first refusal—instead, it claimed ownership of his patents because of the missing Exclusion List under Section 6. Dkt. #29 at ¶ 154 ("Microsoft countered that offer by claiming free exclusive license leading to this litigation."). Accordingly, Plaintiff's facial challenge to the legality of the "right of first refusal" clause under Section 5 is not tied to any

actual dispute, does not rest on any concrete injury, and is not ripe for adjudication. *See Lee v. Capital One Bank*, No. C07-4599-MHP, 2008 WL 648177, at *4 (N.D. Cal. Mar. 5, 2008) (Claim does not present a "case or controversy" because "the allegedly unconscionable provisions in the Agreement have not been implicated in an actual dispute."). Plaintiff invokes previously rejected constitutional arguments and the fact that Microsoft's demand letter is public record, Dkt. #34 at 22-26, but neither of these arguments address the issue that Microsoft never invoked the right of first refusal.

Finally, Plaintiff's request for a declaratory judgment that Microsoft engaged in "inequitable conduct" remains too broad and vague to warrant declaratory relief. The Court previously cautioned Plaintiff that "broad and vague declaratory relief" that "does not 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts' is unripe. Dkt. #20 at 21 (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41 (1937) (internal quotations omitted)). The Court likewise cautioned Plaintiff that his amended complaint "must request specific relief from the Court based on his own dispute with Microsoft—not broad relief based on hypothetical injuries to other Microsoft employees." *Id.* at 22.

Plaintiff's Second Amended Complaint fails to remedy these defects. Plaintiff again requests broad-based relief, claiming "Microsoft action is inequitable in nature" and that the "[p]ublic has tremendous interest in patent rights including how patent rights propagate[] among parties." Dkt. #29 at ¶¶ 170, 172. The Court remains unclear what, within Plaintiff's broad request, he seeks to declare inequitable—Microsoft's use and enforcement of its Employment Agreement in general, its denial of Plaintiff's disclosure list, its transmission of the M&G letter, and/or other allegations referenced throughout the complaint. *See* Dkt. #29 at ¶¶ 167-172. Accordingly, the Court again finds dismissal appropriate.

### G. Leave to Amend

Where claims are dismissed for failure to state a claim on which relief can be granted, permission to file an amended complaint is typically granted. *See* Fed. R. Civ. P. 15(a) ("[L]eave to amend shall be freely given when justice so requires"). However, where amendment would be futile, a claim is properly dismissed with prejudice. *Dumas v. Kipp,* 90 F.3d 386, 393 (9th Cir. 1996); *see also DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) ("A district court does not err in denying leave to amend where the amendment would be futile") (internal citation omitted).

The court recognizes that "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)) (internal quotation marks omitted). However, "federal courts are far less charitable when one or more amended pleadings already have been filed with no measurable increase in clarity." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1217 (3d ed. 2004); *see also Schmidt v. Herrmann,* 614 F.2d 1221, 1224 (9th Cir. 1980).

Here, Plaintiff's Second Amended Complaint is largely identical to his First Amended Complaint and suffers from similar pitfalls. For the second time, Plaintiff has alleged what appears to be, in essence, a contract dispute with Microsoft over the missing Disclosure List. To fit his claims into the framework of the Sherman Act and RICO, Plaintiff has attempted to extrapolate from his own dispute various large-scale antitrust and racketeering schemes against Microsoft employees. However, without offering specific facts beyond his singular case, he has twice failed to plausibly establish a broader scheme or conspiracy. Furthermore, with respect to his missing Disclosure List, he has now twice contradicted his own claims of intentional fraud or conspiracy by acknowledging the possibility of negligent—rather than fraudulent—bookkeeping.

Finally, regarding his requests for declaratory relief, he has failed to remedy the deficiencies the Court identified in its order dismissing Plaintiff's First Amended Complaint. Considering all the above, the Court concludes that permitting further amendment here would be futile.

### IV.    CONCLUSION

Having reviewed Defendant's Motion, Plaintiff's Response, Defendant's Reply, and the remainder of the record, it is hereby ORDERED that Defendant's Motion to Dismiss, Dkt. #32, is GRANTED. Plaintiff's claims are hereby DISMISSED with prejudice and without leave to amend.

DATED this 6th day of April, 2020.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE